J-A07041-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| INDEPENDENT ENTERPRISES, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JD FIELDS & CO., INC. | |
| Appellant | No. 1421 WDA 2014 |

Appeal from the Judgment Entered August 4, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-12-013078

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                    **FILED MARCH 26, 2015**

Appellant, JD Fields & Co., Inc. (JD Fields), appeals from the August 4, 2014 judgment of $38,601.66 entered, after a jury trial, in favor of Appellee, Independent Enterprises, Inc. (Independent).  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this case as follows.

> [Independent] is a construction company specializing in utility contracting involving water and sewer line work.  [JD Fields] is a supplier of sheet piling products.  [Independent] purchased sheet piling material from [JD Fields] … to build a cofferdam in its efforts to complete a construction project.  Sheet piling consists of long, flat sheets of steel that slide together to form a solid wall.  These temporary cofferdams are used to keep water out of a work area.

[On July 27, 2012 Independent] filed this action against [JD Fields] asserting that said sheet piling supplied by [JD Fields] was defective, causing [Independent] to incur additional labor and equipment costs to install and remove the defective material.

In February of 2012, [Independent] first contacted [JD Fields] to obtain information about its interlocking sheet piling products. [Independent] maintains that at said time the purpose of their project was explained to [JD Fields]; and based on [Independent]'s needs, [JD Fields] suggested the use of a specific product, Hoesch 1205k interlocking sheet piling. The marketing materials distributed by [JD Fields] represented that the product, among other things, shall have adequate free play so that the piles can be fitted into each other.

On February 28, 2012, [Independent] issued Purchase Order 51359 (hereinafter "PO"). Said order was a request for 143,985 pounds of Hoesch 1205k sheet piling to be delivered on site in Pittsburgh for the price of $98,629.73. On March 8, 2012, [JD Fields] delivered 143,985 pounds of said material to said site.

[Independent] maintains that as installation of the sheet piling began, its employees immediately experienced a defect in the interlocking mechanism. Specifically, the interlocking mechanism did not contain adequate free play to allow the sheet pilings to be easily joined together. [Independent] further maintained that its employees had substantial experience and training with sheet piling as the installers were members of the local Millwrights and Pile Drivers Union. [Independent] asserted that the contractors had never experienced sheet piling that fit together so poorly. [Independent never paid the invoice for the purchase price of the sheet piling.]

[Independent] claimed that the failure of the sheet piling to conform to the requirements or to [JD Fields'] published specifications constituted a breach

of contract. [Independent] further claimed that the sheet pilings['] failure to conform to the assertions made in the publication provided by [JD Fields], *i.e.* the product could be easily joined, constituted a breach of an express warranty.

…

This matter was initiated by a [c]omplaint filed by [Independent] on July 27, 2012. Following a brief round of preliminary objections challenging both the venue and facts, [JD Fields] filed an [a]nswer, [n]ew [m]atter and [c]ounterclaim on December 19, 2012 [for $104,547.51, the total amount of the purchase price for the sheet piling it provided]. The case was then listed for trial.

The parties were before [the trial court] in late March of 2014, and after argument on [m]otions *in* [*l*]*imine* were held, a three (3) day jury trial took place. At the conclusion of said trial, a [v]erdict was rendered in favor of [Independent] and against [JD Fields] in the amount of $90,875.42 and a verdict was entered in favor of [JD Fields] in its counter claim [sic] in the amount of $52,273.76.[1] The verdict was later molded by the [trial c]ourt to reflect an award in favor of [Independent] in the amount of $38,601.66.

[JD Fields] timely filed a [m]otion for [p]ost-[t]rial [r]elief. Following argument on said [m]otion for [p]ost-[t]rial [r]elief, [the trial court] entered an [o]rder on July 1, 2014 denying [the] same. Judgment on the [v]erdict was entered on August 4, 2014, in the amount of $38,601.66. [JD Fields] filed

_____

[1] The jury's award of $90,875.42 in favor of Independent was based on the invoices it submitted regarding the extra equipment, labor, and two subcontractor costs associated with the sheet piling provided by JD Fields. As we explain *infra*, $52,273.76 was 50% of the JD Fields' invoice, rounded upward to the nearest penny.

a [timely n]otice of [a]ppeal to [this Court] on August 28, 2014.[2]

On September 3, 2014, [the trial c]ourt directed … JD Fields to file a [c]oncise [s]tatement of matters [c]omplained of on [a]ppeal pursuant to Pennsylvania Rule of Appellate Procedure … 1925(b). Said statement was timely filed on September 24, 2014, placing this matter properly before [this Court. The trial court filed its Rule 1925(a) opinion on October 29, 2014].

Trial Court Opinion, 10/29/14, at 1-4 (internal quotation marks omitted).

On appeal, JD Fields presents the following five issues for our review.

1.    Whether expert testimony on the performance and characteristics of steel construction material known as sheet piling and the time it should take to install such sheet piling, the knowledge of which requires special skill and training, was necessary to prove a construction delay claim based on an alleged defect?

2.    Whether the trial court erred in admitting opinion testimony about the existence of a "defect" in the sheet piling and the amount of time that would "normally" be required to install sheet piling where such testimony was provided by fact witnesses who had not been qualified or offered as expert witnesses?

3.    Whether the evidence admitted at trial would not allow any reasonable jury to determine that [JD Fields] breached a contract for the sale of sheet piling to [Independent] in its provision of the sheet piling or that [Independent] established any damages with reasonable certainty?

_____

[2] Independent has not filed a cross-appeal.

4.    Whether, as a matter of law and upon consideration of the evidence at trial, it was error for the trial court to deny JD Fields' motion to set aside the verdict and grant *additur* to the verdict in its favor because, in the absence of any evidence disputing the amount of JD Fields' damages, no two reasonable minds could disagree that the outcome should have been in favor of JD Fields for the amount of its invoice and JD Fields established with reasonable certainty that it had suffered damages in a sum certain amount of $104,547.51?

5.    Whether the trial court erred in failing to grant *remittitur* because the damages award to [Independent], granting it in essence more than its damages claim, was neither fair nor reasonable and instead was excessive, arbitrary, and not supported by the evidence, and shocked the conscience so as to suggest a mistake?

JD Fields' Brief at 5-6.

We begin by noting our standards of review regarding judgment notwithstanding the verdict (JNOV) and the awarding of a new trial.

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard[s] of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

- 5 -

> There are two bases upon which a judgment N.O.V. can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Reott v. Asia Trend, Inc.*, 7 A.3d 830, 835 (Pa. Super. 2010) (citation omitted), *affirmed*, 55 A.3d 1088 (Pa. 2012).

> Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed.

*Joseph v. Scranton Times, L.P.*, 89 A.3d 251, 260 (Pa. Super. 2014) (citations omitted).

We elect to address JD Fields' third issue first, as a ruling in its favor on this issue would entitle it to judgment. In its third issue, JD Fields avers that it is entitled to JNOV because "the evidence was, as a matter of law, insufficient to create an issue of fact for the jury, and JD Fields was entitled to a verdict in its favor." JD Fields' Brief at 34. Specifically, JD Fields argues

- 6 -

that the evidence is insufficient to establish that it breached its contract with Independent and that Independent established its damages with reasonable certainty. *Id.* at 34-35.

Generally, "[t]o successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Albert v. Erie Ins. Exch.*, 65 A.3d 923, 928 (Pa. Super. 2013) (citation omitted). Furthermore, with regard to damages, our Supreme Court has noted the following.

> Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Helpin v. Trustees of Univ. of Pa.*, 10 A.3d 267, 270 (Pa. 2010). Additionally, "Pennsylvania law has never required proof of such damages to a mathematical certainty. This Court has long held that the evidence necessary to establish damages is no more than 'the best evidence available.'" *Hatwood v. Hosp. of the Univ. of Pa.*, 55 A.3d 1229, 1237 (Pa. Super. 2012) (internal citations omitted), *appeal denied*, 65 A.3d 414 (Pa. 2013). As an appellate court, "[i]f the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we

might have awarded different damages." ***Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.***, 98 A.3d 645, 659-660 (Pa. Super. 2014) (*en banc*) (citation omitted).

As the trial court notes, "[t]his cause of action was merely to determine whether the product supplied by [JD Fields] met the representations made by [JD Fields], *i.e.*, that the sheet piling supplied by [JD Fields] allowed for adequate 'free play' as promised."[3]  Trial Court Opinion, 10/29/14, at 7-8.  In this case, Independent elicited testimony on direct examination from Jack Cargoni, an operating engineer and owner of Independent, that the bulk of the sheet piling had "free play" issues after delivery.

> Q:   You heard [other witnesses] describe the problems that they experienced with the sheet piling?
>
> A:   That's correct.
>
> Q:   And did you observe them taking these steps to try to fit the sheet piling together?
>
> A:   I was involved with it.  100 percent throughout the whole ordeal.
>
> …
>
> Q:   What did you do once those problems started?

---

[3] Independent refers to this as an "express warranty" regarding the sheet piling.  Independent's Brief at 12.  JD Fields does not challenge this characterization. ***See generally*** JD Fields' Reply Brief at 2 n.1.

A:    Whenever -- as soon as we started having problems, big problems as far as the sheets not going in at all, we had minor problems to start with and then we started having major problems, and that's when I got ahold of the office to get ahold of Geno Shore to get ahold of JD Fields and have a representative sent out immediately.

Q:    Now, we said there are 85 pairs.  Did every one of these 85 pairs not fit together?

A:    No.  There was some that mated up.  Some that mated up.

Q:    Slid together?

A:    Slid together.  And there was some that just didn't slide together at all.

Q:    As a percentage of the whole, how many of them did you have -- how many sheets did you have problems with?

A:    75 percent of them.

N.T., 3/25/14, at 172-173.  JD Fields' own witness, Dan Abbondanza, who was called to the site after Independent reported the problems, acknowledged that 25% of the sheet piling had this issue.  *Id.* at 266.

As to damages, Cargnoni testified that he drew up an invoice for the extra costs associated with the sheet piling provided by JD Fields, including additional labor costs.  N.T., 3/25/14, at 184.  Cargnoni divided such costs into four distinct categories, equipment, labor, and two contractor-subcontractor categories.  *Id.* at 185.  Cargnoni explained to the jury how each line was calculated in detail.  *Id.* at 185-189.  Cargnoni sent the

invoice to JD Fields, but it did not pay said invoice. *Id.* at 189. Cargnoni later adjusted the labor costs downward in a second invoice. *Id.* at 191-192. These invoices were admitted without objection. *Id.* at 184, 235.

Although JD Fields points out inconsistencies in Independent's witnesses' testimony regarding damages, these inconsistencies do not render Independent's evidence insufficient. *See DeArmitt v. N.Y. Life Ins. Co.*, 73 A.3d 578, 593 (Pa. Super. 2013) (stating with regard to calculation of damages, "[a]lthough the factfinder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages[]") (citation omitted); *Epstein v. Saul Ewing, LLP*, 7 A.3d 303, 314 (Pa. Super. 2010) (stating, "[w]here the evidence of damages presented by the plaintiff is contested by the defendant, the jury in a civil action does not have to accept the plaintiff's measure of damages because the jury is free to accept all, part, or none of the evidence[]") (citation omitted), *appeal denied*, 20 A.3d 1212 (Pa. 2011). Based on these considerations, we conclude there is evidence in the record for the jury to conclude that Independent proved breach and damages by a preponderance of the evidence. *See Reott*, *supra*. As a result, JD Fields is not entitled to relief on this issue.

We next address JD Fields' first and second issues together, as they are interrelated. In its first issue, JD Fields argues that Independent was required to provide expert testimony to establish "the purported cause of

any installation issues with the [s]heet [p]iling." JD Fields' Brief at 25. JD Fields further avers that Independent failed to "present expert testimony to allow the jury to conclude that any such installation issues caused [it] to suffer a delay, and thus damages, on the River Crossing Project." *Id.* In its second issue, JD Fields argues that Independent's witnesses who testified to the subject matters of "the performance and characteristics of sheet piling, [the] installation time for sheet piling, and whether the [s]heet [p]iling had adequate free play[]"offered only inadmissible lay opinion evidence. *Id.* at 30. Our standard of review with regard to evidentiary issues at trial is well settled.

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Phillips v. Lock*, 86 A.3d 906, 920 (Pa. Super. 2014) (citation omitted).

Pennsylvania Rules of Evidence 701 and 702 describe the interplay between lay witnesses and expert witnesses.

**Rule 701. Opinion Testimony by Lay Witnesses**

- 11 -

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 701, 702.

JD Fields points to several cases in which the courts of this Commonwealth have held expert testimony was required to assist the trier of fact. In ***Electron Energy Corp. v. Short***, 597 A.2d 175 (Pa. Super. 1991), *affirmed*, 618 A.2d 395 (Pa. 1993), this Court held that expert testimony was required in a breach of contract action in order to show that there was a breach of "a duty to design a [heating and cooling] system up to reasonable professional standards[.]" ***Id.*** at 180. JD Fields also points to

the Commonwealth Court's decision in **Tennis v. Fedorwicz**, 592 A.2d 116 (Pa. Cmwlth. 1991) in which it concluded that expert testimony was "indispensable for proving that the road was negligently designed."[4] **Id.** at 117.

In this case, Independent presented the testimony of Arthur Klajnowski. Before Klajnowski began his testimony, the trial court cautioned counsel that Klajnowski was not to give any expert opinion, but rather "[h]e can only talk about facts, what he actually saw on the job." N.T., 3/24/14, at 48. Klajnowski had been employed with the local pile drivers' union for 27 years. **Id.** at 50. Klajnowski worked on this particular job with Independent and he explained the difficulties he faced working with this sheet piling on this specific job.

> Q: Can you describe for the jury what the problem
>    is that you experienced on this job?
>
> A: The sheet piling would not go together. It
>    would not run. Meaning -- by run, I mean
>    when you drop it, it is supposed to go down to
>    the bottom. It wasn't doing that.
>
> Q: When you drop it, describe for the jury when
>    you drop it.

---

[4] We note that "[t]his Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." **Petow v. Warehime**, 996 A.2d 1083, 1088 n.1 (Pa. Super. 2010) (citations omitted), *appeal denied*, 12 A.3d 371 (Pa. 2010).

A:     With the crane.  You have the crane and let them come down on it. They are supposed to slide together.

…

Q:     What did you have to do to deal with the difficulty in sliding these pieces together?

A:     We actually had to get an air tugger and burn holes in the bottom of the sheet, hook them to the template and drag them down.

Q:     What is an air tugger?

A:     It is actually like a chain pull.  It is a chain with hooks on either end powered by air that turns and pulls the sheet piling down.

…

Q:     Did you do anything else?  Did you have to do anything else besides use an air tugger?

A:     Yes.  They actually greased the sheets first and then they decided to use soap on them to try to get them to slide.

Q:     Did that help?

A:     Not really.

Q:     Did you try anything else other using an air tugger and greasing or soaping the channels?

A:     We used a vibratory hammer that you're supposed to use to drive the sheets down once they are in.  We used -- looks like a hairpin. That's what we call it.  It is just weight to get on top of the sheet and try to push it with that.

*Id.* at 55-59.

Independent also called Michael Pape, its foreman on this project, to testify to the sheet piling and the problems that he encountered.

> Q: Tell us what you understand sheet piling to be.
>
> A: It is an interlocking system for whatever kind of work, shoring or dirt jobs, cofferdams or whatever need be.
>
> …
>
> Q: Tell us very succinctly the problem with the sheet piling on this project.
>
> A: The sheet piling wouldn't go together.
>
> Q: What solutions did you try to employ to solve that?
>
> A: We cut the tips of the sheet piling that was already instituted in the river. We cut a notch out in the sheet piling that we are going to bring into the river, we do cut a notch out to try to get it going and it catch the notch where you already have a couple inches going in there and we would soap it up with a lubricant to try to get it to slide together.
>
> Q: Are you on site when you removed the sheet piling in this case?
>
> A: Yes.
>
> Q: Were there any problems removing the sheet piling from the river?
>
> A: Yes.
>
> Q: What were the problems?
>
> A: We couldn't get them -- some of them would pull apart and we had trouble. You go to pull one out and you would be pulling three or four

sheets at one time to get them out, so we got -- instead of trying to separate them and get them out, we would swing them off the river and lay them on the ground and try to pull them apart with an excavator so we could get them on the truck and load them up.

Q:   Had you had to use excavators to pull them apart on a prior sheet piling project that you worked on?

A:   No.  We slid them apart.

*Id.* at 72, 89-90.

Here, the trial court concluded that expert testimony was not required in this case based on the following.

> [The trial court] heard nothing prior to or during the trial to convince the [trial] court that the jury would need the assistance of an expert with the concept of two pieces of sheet metal not fitting together.  Nor did [the trial court] hear any testimony from either side that sounded too highly technical or beyond a layperson's understanding.
>
> The case *sub judice* was not a professional malpractice action or complex products liability matter involving complex language or techniques necessitating opinions proffered by an expert, nor does the instant case involve a design defect of a technical nature.  This cause of action was merely to determine whether the product supplied by [JD Fields] met the representations made by [JD Fields], *i.e.*, that the sheet piling supplied by [JD Fields] allowed for adequate "free play" as promised.

Trial Court Opinion, 10/29/14, at 7-8.

After careful review, we agree with the trial court's reasoning and conclusion.  Unlike **Electron Energy Corp.** and **Tennis** there was no

requirement that the jury needed to find that JD Fields breached a duty of care or that the sheet piling had a design defect. As Independent argues, it does not matter why the sheet piling did not fit together as promised, just that it did not do so. Independent put forth factual evidence in the form of testimony from Klajnowski and Pape as to what occurred with this particular shipment of sheet piling on this specific construction job. This did not cross into the realm of impermissible expert opinion under Rule 702, nor was it improper lay opinion under Rule 701. Rather, Klajnowski and Pape testified to what they observed personally regarding this product on this job, as a matter of fact, not as a matter of opinion.[5] Cargnoni testified that he expected to install 15 to 20 piles in an eight-hour shift, this answer was based on his experience, and was his estimate for this project. **See generally** N.T., 3/24/14, at 162. Klajnowski testified, based on his experience, that one could put 158 sheets in per day. **Id.** at 63. Based on

_____

[5] JD Fields highlights one instance where Klajnowski stated that the sheet piling was "supposed to fit together[.]" N.T., 3/24/14, at 55. However, the record reveals that JD Fields immediately objected, the trial court sustained JD Fields' objection, and JD Fields requested no further relief from the trial court. **Id.** at 56. As the trial court ruled in JD Fields' favor on this specific instance, it cannot complain about it on appeal. **See generally Coffey v. Minwax Co., Inc.**, 764 A.2d 616, 622 (Pa. Super. 2000). In its brief, JD Fields complains that Klajnowski gave expert testimony when he stated that other factors did not cause the problems they had with the sheet piling. JD Fields' Brief at 32; N.T., 3/24/14, at 61. However, we note JD Fields did not object to this question, thus waiving the issue on appeal. **See id.**

- 17 -

these considerations, we conclude the trial court did not abuse its discretion with regard to these issues. *See Phillips*, *supra*.

Finally, we elect to address JD Fields' fourth and fifth issues together, as they pertain to the damage awards in this case. In its fourth issue, JD Fields argues that the jury should have awarded damages on its counterclaim in the amount of $104,547.51. JD Fields' Brief at 38. It argues that because the parties stipulated to the existence of the contract, which contained a purchase price of $104,547.51, and Independent "offered no evidence to discount the amount of damages cause[d] to JD Fields by [Independent's] refusal to pay the invoice[,]" JD Fields should have been awarded the invoice amount in full. *Id.* at 38-39. JD Fields also argues that it is entitled to prejudgment interest at the rate of six-percent per annum beginning on April 8, 2012. *Id.* at 41. Finally, in its fifth issue, JD Fields avers that it is entitled to *remittitur* because the jury's $90,875.42 award to Independent on its claim "was neither fair nor reasonable." JD Fields' Brief at 42. JD Fields further argues that Independent "was more than made whole for its purported and unsupported damages and put into a position better than if the contract between the parties had been performed." *Id.*

As noted above, "[w]here an appellant's claim arises from a challenge to the jury's determination of damages, our review is highly circumspect." *Helpin*, *supra* at 601 n.9.

> The duty of assessing damages is within the province of the fact-finder and should not be interfered with

- 18 -

> unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. Generally, a verdict will not be disturbed merely on account of the smallness of the damages awarded or because the reviewing court would have awarded more. To support the granting of a new trial for inadequacy, the injustice of the verdict should stand forth like a beacon. So long as the verdict bears a reasonable resemblance to the damages proved, it is not the function of the court to substitute its judgment for that of the jury.

**Epstein**, **supra** (citation omitted). In addition, we note our standard of review of a denial of *remittitur* is whether or not the trial court abused its discretion. **Paliometros v. Loyola**, 932 A.2d 128, 134 (Pa. Super. 2007) (internal citations omitted).

In this case, the parties appear to agree that the purchase price for the sheet piling was $104,547.51. JD Fields' Brief at 38; Independent's Brief at 13. As noted above, Independent's witness testified that 75% of the sheet piling that was delivered did not fit together. N.T., 3/25/14, at 173. JD Fields' witness, Abbondanza, testified that 25% of the sheet piling had this issue. **Id.** at 266. The mean and median between these two percentages is 50%. The jury awarded JD Fields $52,273.76 on its counterclaim, which is 50% of the purchase price agreed to by the parties, rounded upward to the nearest penny. **See generally** JD Fields' Brief at 38; Independent's Brief at 13. As the trial court noted, "the jury simply reconciled the testimony to accept the fact that half of said sheets would not allow for adequate 'free play' and awarded their damage figure accordingly."

Trial Court Opinion, 10/29/14, at 8. As there is a basis for the jury's decision, as an appellate court, we will not substitute our judgment for the jury or grant *additur* because this Court might "have awarded more." ***Epstein***, ***supra***. In addition, we further conclude that *remittitur* is not warranted. The jury's verdict in this case found that Independent was 50% liable for the purchase price of the sheet piling that Independent received. Therefore, Independent did not receive a windfall as JD Fields argues, and the jury's verdict does not shock the conscience. We hence conclude that the trial court did not err or abuse its discretion when it denied *additur* or *remittitur* in this case. ***See id.***; ***Paliometros***, ***supra***.

Turning to the prejudgment interest portion of its argument, JD Fields relies on Section 354 of the Restatement (Second) of Contracts in support of its argument.[6] JD Fields argues that it is entitled as of right to prejudgment interest under Section 354(1) of the Restatement, as the issue in this case

_____

[6] Independent argues that JD Fields waived this issue "by failing to raise the issue at trial, and by failing to request an instruction to the jury on the same during the charging conference." Independent's Brief at 14. However, this Court has held that "even if the issue of prejudgment interest was not submitted to the jury, the trial court may mold the verdict to include it." ***Verner v. Shaffer***, 500 A.2d 479, 482 (Pa. Super. 1984); ***see also McMahon v. Caravan Refrigerated Cargo, Inc.***, 594 A.2d 349, 352 (Pa. Super. 1991) (distinguishing ***Verner*** and concluding the prejudgment interest issue was waived because, unlike ***Verner***, "the issue of pre-judgment interest was not raised in appellee's post-trial motions[]"). JD Fields raised the issue of prejudgment interest in its post-trial motion. JD Fields' Post-Trial Motion, 4/4/14, at ¶ 24. As a result, JD Fields has not waived this issue.

was a sum certain. JD Fields' Brief at 41. The restatement provides as follows.

**§ 354 Interest as Damages**

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

…

Restatement (Second) of Contracts § 354(1) (1981). Furthermore, our Supreme Court has explained the issue of prejudgment interest in the following terms.

In adopting Section 354 [of the Restatement (Second)], we stated:

For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon contract is a legal right. That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment.

*Fernandez*[*v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988)].

With regard to prejudgment interest, we have explained, "[i]nterest has been defined 'to be a compensation allowed to the creditor for delay of payment by the debtor,' and is said to be impliedly due 'whenever a liquidated sum of money is unjustly withheld.'" *School Dist. of City of Carbondale v. Fidelity & Deposit Co. of Maryland*, 346 Pa. 491, 492, 31 A.2d 279, 280 (1943) (citations omitted). However, "as prerequisites to running of prejudgment interest, the debt must have been

- 21 -

liquidated with some degree of certainty and the duty to pay it must have become fixed." **Id.** at 493, 31 A.2d at 280; Restatement (Second) of Contracts § 354(1) ("If the breach consists of a failure to pay a definite sum of money or to render a performance with fixed or ascertainable monetary value, interest is recoverable."). Thus, even where the terms of a contract do not expressly provide for the payment of interest, a nonbreaching party has a legal right to recover interest, as damages, on a definite sum owed under the contract.

Furthermore, as is the case with an award of contractual interest, an award of prejudgment interest under Section 354(1) is not subject to a court's discretion. **See id.; Dox Planks**[**of Ne. Pa. v. Ohio Farmers Ins. Co.**, 621 A.2d 132, 136 (Pa. Super. 1993)] (citing **Fernandez**, and holding a successful plaintiff in a contract case is entitled to prejudgment interest at the statutory rate as a matter of right); **Peterson v. Crown Fin. Corp.**, 661 F.2d 287, 293 (3rd Cir. 1981) (applying Pennsylvania law and holding that a "court is thus obligated to award 'simple interest at the statutory legal rate' only in those circumstances in which the plaintiff proves that the defendant breached a promise to pay 'a definite sum of money'").

**TruServ Corp. v. Morgan's Tool & Supply Co., Inc.**, 39 A.3d 253, 263-264 (Pa. 2012) (emphasis in original; footnotes omitted).

Independent counters that JD Fields' reading of Section 354 is flawed and offers the following illustration from the comment to Section 354.

9. A contracts to build a bungalow for B for $30,000. After completion but before B has paid the final $6,000, B occupies the bungalow but refuses to pay the balance because the workmanship and materials are unsatisfactory. A sues B and recovers only $4,000 on the ground that B's claim entitles him to compensation in the amount of $2,000. The sum of $4,000 was not sufficiently definite to give A a right

> to interest on it. The allowance of interest is within the discretion of the court. The fact that A was himself in breach will be considered.

Independent's Brief at 15, *quoting* Restatement (Second) of Contracts § 354, *cmt*.

In our view, this illustration is much like the instant case. Here, JD Fields agreed to provide sheet piling to Independent for $104,547.51. After receiving said sheet metal, Independent refused to pay the invoice because it viewed the sheet metal as unsatisfactory. JD Fields filed a counterclaim against Independent seeking the amount due under the original contract. JD Fields was awarded 50% of their original contract or $52,273.76. Following the Restatement, we agree with Independent that this amount "was not sufficiently definite to give [JD Fields] a right to interest on it." Restatement (Second) of Contracts § 354, *cmt*. As a result, JD Fields did not have a legal right to prejudgment interests under Section 354(1), as there was not a sum certain in this case. **See id.**; **TruServ Corp.**, **supra** at 264 n.12. Based on these considerations, we conclude JD Fields is not entitled to relief on its fourth or fifth issues.

Based on the foregoing, we conclude all of JD Fields' issues on appeal are devoid of merit. Accordingly, the trial court's August 4, 2014 judgment entered in favor of Independent is affirmed.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/26/2015